THE PEOPLE *ex rel.* TYRONE C. FAHNER, Attorney General, Plaintiff-Appellee, *v.* RAYMOND HEDRICH, Indiv. and d/b/a Oak Grove Mobile Home Village, Defendant-Appellant.

Second District   No. 81—454

Opinion filed July 14, 1982.

Richard D. Shearer, of Shearer, Blood, Agrella, Boose and Balog, of St. Charles, and Ronald L. Barnard and Gary B. Shulman, both of Barnard and Associates, Ltd., of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Chicago (William C. Shapiro, Assistant Attorney General, of counsel), for appellee.

JUSTICE VAN DEUSEN delivered the opinion of the court:

The defendant, Raymond Hedrich, appeals from a verdict finding him guilty of violating provisions of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1979, ch. 121½, par. 261 *et seq.*) and the Mobile Home Landlord and Tenant Act (Ill. Rev. Stat. 1979, ch. 80, par. 201 *et seq.*). As a result of these violations, the court imposed an injunction and required the defendant to pay restitution, a fine and attorney fees.

For approximately 30 years, Hedrich has owned and operated the

Oak Grove Mobile Home Village (Oak Grove). Through Oak Grove, the defendant rents parking spaces for owners of mobile homes. He also sells new and used mobile homes, as well as, parts and accessories for mobile homes.

Before January 1, 1980, the defendant did not use written leases when renting out a lot. The lots were rented as month-to-month tenancies. Prior to January 1, 1980, when several tenants of Oak Grove wanted to sell their mobile homes, the defendant informed them that if the mobile home was to remain on the Oak Grove lot after the sale, the tenant-seller would be required to pay a fee of approximately $1,500 to the defendant. The tenant-seller was not required to pay the fee if he removed the mobile home from the lot. None of the tenants were notified of this charge until after they had located their mobile home on the lot and were ready to sell the mobile home. The evidence indicated that there was a shortage of mobile home lots in the area and that it would cost hundreds of dollars to relocate a mobile home.

At trial, it was shown that prior to January 1, 1980, 23 tenants-sellers were required to pay $1,500 each to allow their mobile homes to remain on the lot after a sale. One tenant paid $500, and another paid $3,000. The evidence also indicates that the defendant performed little or no services in connection with the transfer.

Because of these fees, some of the Oak Grove tenant-sellers filed consumer complaints against the defendant. As a result of the consumer complaints filed with the Consumer Protection Division of the Illinois Attorney General's Office, a subpoena issued against the defendant in November of 1979. The defendant was unable to resolve the outstanding consumer complaints. On December 13, 1979, the Attorney General's Office filed a complaint alleging that the defendant had violated the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1979, ch. 121½, par. 261 *et seq.*). The complaint was later amended to add a second count which alleged violations of the Mobile Home Landlord and Tenant Act (Ill. Rev. Stat. 1979, ch. 80, par. 201 *et seq.*). The Attorney General's Office also filed a petition for a temporary restraining order. The trial court granted the order and restrained defendant from imposing a fee on the sale of a mobile home unless the fee was in compliance with the provisions of the Mobile Home Landlord and Tenant Act. This order became a preliminary injunction.

On January 20, 1981, after several contempt proceedings, a trial on the complaint began. On February 10, 1981, after hearing the evidence, the trial court found that the defendant had violated section 2

of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1979, ch. 121½, par. 262) and sections 6, 9 and 24 of the Mobile Home Landlord and Tenant Act (Ill. Rev. Stat. 1979, ch. 80, pars. 206, 209, 224). As a result of these violations, the defendant was permanently enjoined from collecting a fee upon the sale of a tenant's mobile home, unless the fee was an amount directly related to services performed by the defendant, and the fee was disclosed to the tenant in a lease or by agreement prior to the sale. The trial court also ordered the defendant to pay $38,000 in restitution to the former tenants who had paid the fee. The defendant also received a $200 fine and was ordered to pay attorney fees.

■ Initially, the defendant contends that the trial court erred in that the Consumer Fraud and Deceptive Business Practices Act (Act) is not applicable to transactions between a mobile home park landlord and tenant. We note, however, that the applicability of the Act was never clearly raised before the trial court; therefore, it may be considered waived. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147.) However, because the issue is one of public importance concerning a matter of statutory interpretation and because all of the facts necessary for a determination of the issue are before the court, this court of review may rule on the issue. *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 61.

■ Section 2 of the Act provides that the use of any one of a variety of deceptive or unfair practices in the conduct of any "trade or commerce" is unlawful. (Ill. Rev. Stat. 1979, ch. 121½, par. 262.) The defendant contends that the trial court erred in finding that the business of leasing lots and providing services for mobile homes is a " 'trade' or 'commerce' " as defined in section 1(f) of the Act. (Ill. Rev. Stat. 1979, ch. 121½, par. 261(f).) Under section 1(f), the phrase "trade or commerce" means the "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed and any other article, commodity or thing of value wherever situated ***." (Ill. Rev. Stat. 1979, ch. 121½, par. 261(f).) In *Scott v. Association for Childbirth at Home, International* (1981), 88 Ill. 2d 279, 284, the Illinois Supreme Court held that the broad language of this definition "evidences an intent that the Act have correspondingly broad applicability." Additionally, section 11a (Ill. Rev. Stat. 1979, ch. 121½, par. 271a) of the Act mandates a liberal construction of the Act to effect its purposes. Under a liberal construction of the broad language of section 1(f), the defendant's leasing of lots and providing utilities to his tenants are a "distribution of services" and, therefore, a "trade or commerce" as defined by the

Act.

In *Commonwealth v. DeCotis* (1974), 366 Mass. 234, 316 N.E.2d 748, the Massachusetts Supreme Court was faced with the exact same question. In *DeCotis* the defendant, an owner of a mobile home park, was charged with committing an unfair and deceptive trade practice by charging a resale fee similar to the fee charged in the case at bar. Interpreting a definition of "trade or commerce" substantially identical to the definition in the Illinois statutes, the court held that "[c]learly the leasing of lots for mobile homes is a 'trade' or 'commerce.'" 366 Mass. 234, 239, 316 N.E.2d 748, 752.

The defendant cites *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, for the proposition that the Act is inapplicable because the former tenants are not "consumers" as defined in section 1(e) (Ill. Rev. Stat. 1979, ch. 121½, par. 261(e)). The *Steinberg* court held that because Steinberg was only an applicant to the school and not a purchaser of its educational services, he was not a consumer. (See *Scott v. Association for Childbirth at Home, International* (1981), 88 Ill. 2d 279, 285.) We note, however, that in *Steinberg*, the issue was whether a rejected applicant was a "consumer" with standing to bring a cause of action. Thus, it appears that while the definition of consumer as set out in section 1(e) may be pertinent for determining whether a plaintiff has standing, it is not a question of importance in a case, like the present case, which has been brought by the Attorney General's Office. *Scott v. Association for Childbirth at Home, International* (1981), 88 Ill. 2d 279, 285; see also *Beard v. Gress* (1980), 90 Ill. App. 3d 622.

■ Furthermore, the tenants who were required to pay the $1,500 service fee are consumers under the Act. Section 1(e) of the Act defines a consumer as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." (Ill. Rev. Stat. 1979, ch. 121½, par. 261(e).) Section 1(b) defines "merchandise" to include "any objects, ware, goods, commodities, intangibles, real estate situated outside of the State of Illinois, or services; ***." (Ill. Rev. Stat. 1979, ch. 121½, par. 261(b).) From the evidence at trial it is clear that under the leasing agreement, the tenants contracted for various services to be supplied by the defendant, *i.e.*, maintaining the utilities and road within the complex, providing snow and garbage removal, and allowing for the use of the lot. Therefore, the tenant contracted for the purchase of "merchandise" as defined in section 1(b) and, under section 1(e), is a "consumer." (See *Love v. Pressley* (1977), 34 N.C.App. 503, 239 S.E.2d 574; *Common-*

*wealth v. Monumental Properties, Inc.* (1974), 459 Pa. 450, 329 A.2d 812.) We, therefore, conclude that the trial court did not err in determining that the consumer fraud statute is applicable in the present case.

■ The defendant next contends that the charging of the transfer fee was not an unfair or deceptive practice under section 2 of the Act. Section 2 states that when determining whether a practice violates this section of the Act, consideration is to be given to the interpretations of the Federal Trade Commission and the Federal courts relating to section 5(a) of the Federal Trade Commission Act (15 U.S.C. sec. 45(a)(1) (1976)), which provides in pertinent part:

> "Unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. sec. 45(a)(1) (1976).

In *Federal Trade Commission v. Sperry & Hutchinson Co.* (1972), 405 U.S. 233, 244-45 n.5, 31 L. Ed. 2d 170, 179 n.5, 92 S. Ct. 898, 905 n.5, citing 29 Fed. Reg. 8355 (1964), the court set out the standards employed by the FTC in determining whether a practice was deceptive or unfair:

> " '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' "

In the present case, the facts concerning the allegedly illegal practices are undisputed. Prior to locating their mobile homes on one of the defendant's lots, new tenants were not informed of the possibility of an assignment fee upon resale of their mobile homes. The owners incurred considerable set-up expenses when placing their mobile homes on the leased lots. Relocating a mobile home is costly. Because of these expenses and an apparent shortage of lots, an established mobile home located in a good mobile home park was easier to sell and would obtain a higher price—a price that would allow the seller to recover his initial cost of locating the home in the park. When an Oak Grove tenant told the defendant that he desired to sell his mobile home, the defendant informed the tenant that after the home was sold, the tenant could either remove the mobile home from the park or pay the defendant a $1,500 "sales commission." The defendant performed little or no services in connection with the sales.

Under these facts, the first criterion of *Sperry & Hutchinson* has been met. Here, the defendant has made a practice of charging an unconscionably disproportionate price for little or no services. This practice "offends public policy as it has been established by statutes, the common law, or otherwise *** it is within at least the penumbra of some common-law statutory, or other established concept of unfairness." Moreover, the defendant was able to collect this unconscionably large fee for little or no services merely because the tenants "were in a position in which they had no reasonable alternative but to pay and to agree to pay." (*Commonwealth v. DeCotis* (1974), 366 Mass. 234, 243, 316 N.E.2d 748, 755.) This practice can be characterized as "oppressive." Thus, the second criterion of *Sperry & Hutchinson* has been met.

Finally, the tenants as consumers are injured by the defendant's charging of a $1,500 fee, but providing virtually no services for the fee. Under the three standards of *Sperry & Hutchinson,* the trial court did not err in determining that the resale fee was an unfair or deceptive practice under the Consumer Fraud Act. *Commonwealth v. DeCotis* (1974), 366 Mass. 234, 316 N.E.2d 748.

The defendant contends that he had two valid business reasons for the fee: (1) the seller could obtain a higher price for the mobile home because the home was located on Hedrich's lot and (2) the sale of the tenant's used mobile home would infringe upon the business of mobile home sales that Hedrich conducted at the Oak Grove Park. Hedrich seems to argue that by allowing his tenants to sell their mobile homes situated on a lot, his business of mobile home sales is forced to compete on an equal footing with the tenants of the park. Apparently, the defendant believes that the $1,500 fee is a valid charge to compensate him for the loss of his competitive edge over his tenants.

Even if this court accepts the defendant's arguments that such an assignment fee, even one that is highly disproportionate to the services rendered, is a valid fee, the defendant's practice is still a deceptive, illegal practice inasmuch as he has failed to inform prospective tenants of the fee until after a tenant had expended a considerable sum of money to move a mobile home onto the defendant's park. Had the prospective tenant been aware of defendant's intention to impose such a "sales commission," the tenant may have chosen to locate in another park or not to purchase or reside in a mobile home at all. Because once a mobile home is located on a lot, a tenant who desires to sell the mobile home has no reasonable alternative but to pay the fee, failure to disclose such a large fee is deceptive, oppressive, and potentially injurious to the consumer. Under *Sperry & Hutchinson*, the fail-

ure to disclose the existence and the terms of the fee is a clear violation of the Illinois consumer fraud provisions.

The defendant next contends that finding this fee to be illegal infringes upon his right to control and freely alienate his real property. We note, however, that requiring the defendant to disclose the existence of and the terms of a resale fee, including the arbitrary manner in which the defendant intends to administer that fee, before a tenant makes the substantial investment of locating a mobile home in the park does not infringe upon these rights.

The defendant's next claim of error arises from the trial court's refusal to allow a line of questioning to be asked of a witness by the name of Virginia Schwenk.

During the trial, Ms. Schwenk testified that the defendant charged her a $1,500 "sales commission" at the time she sold a mobile home located on defendant's lot. On cross-examination, it was established that she received $9,000 for the mobile home. Defense counsel then inquired if she had "investigated similar prices for mobile homes." The plaintiff objected to the question on the ground of relevancy. The objection was sustained. Although the defense attorney spoke to the objection, he did not make a formal offer of proof.

In *Hession v. Liberty Asphalt Products, Inc.* (1968), 93 Ill. App. 2d 65, 71, the court noted that "the requisite formality of an offer of proof will depend upon the circumstances of the particular case. Where it is obvious that the witness is competent to testify to a fact, and it is obvious what his testimony will be if he is permitted to give it, a brief statement by counsel may suffice. ***[H]owever, where it is by no means clear what the witness will say, or what his basis will be for saying it, the offer of proof must be considerably more detailed and specific ***." (See also *Snedden v. Lavenka* (1981), 92 Ill. App. 3d 979, 986.) Here, the offer of proof consisted of two comments which failed to indicate what the witness was expected to say or the basis for the testimony. An offer of proof serves no useful purpose at all if it does not demonstrate, both to the trial and to the appellate courts, the admissibility of the testimony which was foreclosed by the sustained objection. (*Snedden v. Lavenka* (1981), 92 Ill. App. 3d 979, 986; *Miller v. Chicago Transit Authority* (1966), 78 Ill. App. 2d 375, 383.) Thus, with regard to the testimony sought to be elicited from Virginia Schwenk, the defendant failed to make an adequate offer of proof at the trial level, and the trial court's sustaining of the plaintiff's objection is affirmed.

The defendant further contends that the trial court erred in awarding attorney fees. On February 2, 1981, Charles H. Atwell, Jr.,

attorney for the Attorney General's Office, filed an affidavit with the court. In this affidavit, Atwell averred that the sum of $14,693.75 was owed to him for legal services he performed in the prosecution of the case. Atwell also stated that $7,712.50 of this amount was incurred as a result of the defendant's failure to comply with court orders. Attached to the affidavit was a detailed statement of Atwell's work on the case.

After closing arguments, the trial court inquired as to whether it had the authority to award attorney fees. During this time, the defendant neither commented on nor objected to the court's authority to award attorney fees. Moreover, he did not challenge the amount of the fees as set out in Atwell's affidavit. Only in his motion to vacate did the defendant raise any objection to the award of attorney fees. In this motion, the sole issue raised was whether the fees were "grossly unfair and unjustly punitive." The sole issue argued on appeal is whether the trial court had authority to award attorney fees in a case brought by the Attorney General's Office. Because this issue was never raised before the trial court, the defendant cannot raise it for the first time on review. *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147.

The defendant's final contention is that the Mobile Home Landlord and Tenant Act is unconstitutional. Specifically, the defendant challenges the constitutionality of sections 6, 8, 9, 12, 14 and 15 of the statute. (Ill. Rev. Stat. 1979, ch. 80, pars. 206, 208, 209, 212, 214 and 215.) Generally, a court of review will decide the constitutionality of only those provisions of a statute which are sought to be enforced (*Goldblatt v. Town of Hempstead* (1962), 369 U.S. 590, 597, 8 L. Ed. 2d 130, 136, 82 S. Ct. 987, 991), for it is well settled that constitutional questions will not be decided unnecessarily (*Haughton v. Haughton* (1979), 76 Ill. 2d 439, 448). In other words, to have standing to challenge the validity of a provision one must have sustained or be in the immediate danger of sustaining a direct injury as a result of the enforcement of the provision. *Illinois Gamefowl Breeders Association v. Block* (1979), 75 Ill. 2d 443, 451.

Here, because the State has sought to enforce only sections 6, 9 and 24 of the Mobile Home Landlord and Tenant Act, the defendant has standing to challenge the validity of only these three sections. Because the defendant does not challenge the validity of section 24, the only sections which the defendant has effectively challenged are sections 6 and 9.

Initially, the defendant contends that section 6 is unconstitutional in that it is special legislation in violation of article IV, section 13 of

the Illinois Constitution, which provides:

"The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, sec. 13.

Special legislation is that which "confers a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated." (*Illinois Polygraph Society v. Pellicano* (1980), 83 Ill. 2d 130, 137; see also *Bridgewater v. Hotz* (1972), 51 Ill. 2d 103, 109-10.) If, however, there is a reasonable basis for the classification, and if it bears a reasonable and proper relation to the purposes of the act and the evil it seeks to remedy, it has not violated the constitutional proscription of special or local laws. (*Bridgewater v. Hotz* (1972), 51 Ill. 2d 103, 111.) Only if a classification is unreasonable and arbitrary will a court declare the statute invalid. Thus, the special legislation section of the Illinois Constitution allows differentiations between similarly situated persons if the classification is not unreasonable in that it preferentially and arbitrarily includes a class to the exclusion of all others. *Illinois Polygraph Society v. Pellicano* (1980), 83 Ill. 2d 130, 138.

The defendant contends that section 6 is special legislation in that it applies only to mobile home landlords and not to landlords in general. While the defendant notes that this section "specially and negatively" affects mobile home landlords, he fails to indicate how this special effect is unreasonable, preferential or arbitrary. The plaintiff, on the other hand, contends that such a classification is reasonable. In *Rezler v. Village of Riverside* (1963), 28 Ill. 2d 142, 148, the court recognized that there was a necessity for special treatment of mobile home parks. From the evidence introduced at trial, it is apparent that the traditional, residential landlord-tenant relationship is different from the landlord-tenant relationship involved in the leasing of a mobile home lot. Generally, the residential landlord has a substantial investment in the improvements which he is leasing to his tenants, whereas, the mobile home landlord is basically leasing only a lot with utility hook-ups to his tenant. Unlike the traditional, residential tenant, a mobile home tenant moves his own dwelling onto the landlord's lot, and the dwelling becomes affixed to the lot. Because the tenant moves his dwelling onto the landlord's lot, the landlord-tenant relationship is rarely intended to be one of short duration.

■ Section 6, which the defendant asserts as unconstitutional special legislation, merely requires the mobile home landlord to offer prospective tenants a written lease. Because the mobile home landlord

is primarily leasing the land and not improvements on the land and because of the relatively substantial cost incurred by tenants which are moving and affixing a mobile home onto a lot, requiring mobile home landlords to offer written leases is not arbitrary or unreasonable. Rather, it is "based on a rational difference of condition or situation existing in the persons or objects upon which the classification rests." (*Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 311.) Section 6 of the Mobile Home Landlord and Tenant Act is not special legislation which violates the Illinois Constitution.

■■ The defendant further contends that sections 6 and 9 are unconstitutional in that they violate the equal protection clauses of the United States and the Illinois constitutions. As noted earlier, section 6 requires mobile landlords to offer written leases. Section 9 requires that the written lease clearly set forth the rental terms and specifically itemize all other charges. It is argued that these provisions of the Mobile Home Landlord and Tenant Act deny equal protection of the law "by segregating a certain class of property owners, *i.e.*, person owning land for use by mobile home owners."

The first test in assessing an equal protection claim is to determine if the statute in question operates to the disadvantage of a suspect class or infringes upon a fundamental right. (*Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 119; see also *San Antonio Independent School District v. Rodriguez* (1973), 411 U.S. 1, 17, 36 L. Ed. 2d 16, 33, 93 S. Ct. 1278, 1288.) While the defendant does not assert that mobile home park owners are a suspect class, he does argue that the statute infringes on his fundamental right to use his property as he chooses. The statutory requirement of a written lease with a full disclosure of all terms does not infringe upon that right.

If the statute does not involve a suspect class and does not infringe on a fundamental right, "the legislation simply must bear a rational relationship to a legitimate governmental interest." *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 120.

In *Illinois Housing Development Authority v. Van Meter*, the court discussed this rational-basis test:

"Under traditional concepts of equal protection, *i.e.*, when a rational-basis test is used, a legislative classification is presumed valid. [Citations.] The burden of rebutting the presumptive validity of the classification rests upon the party challenging its constitutionality. [Citation.] Finally, a statutory

classification will not be declared unconstitutional 'if any state of facts reasonably may be conceived to justify it.' [Citations.]." (82 Ill. 2d 116, 122, citing *McGowan v. Maryland* (1961), 366 U.S. 420, 426, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101, 1105.) Thus, the inquiry shifts to an analysis of a legislative purpose and a subsequent determination of whether the legislative classification is rationally related to that purpose. *In re Estate of Karas* (1975), 61 Ill. 2d 40, 47-48.

A reading of the Mobile Home Landlord and Tenant Act indicates that the purpose of sections 6 and 9 of the Act is to protect tenants from landlords who would take unfair advantage of a tenant by raising rental fees and adding charges after the tenant has expended funds by affixing a dwelling onto the rented premises. This appears to be a legitimate governmental interest, and the distinction between the traditional landlord and the mobile home landlord is a legislative classification which is rationally related to that purpose. Therefore, it appears that the defendant has failed to overcome the presumption of validity for both section 6 or section 9.

██ Finally, the defendant contends that section 9 of the Mobile Home Landlord and Tenant Act is unconstitutionally vague. In pertinent part, section 9 provides:

"The terms for payment of rent shall be clearly set forth and all charges for services, ground or lot rent, unit rent, or any other charges shall be specifically itemized in the lease and in all billings of the tenant by the park owner." (Ill. Rev. Stat. 1979, ch. 80, par. 209.)

The trial court determined that the defendant's leases violated this provision in that they contained a provision allowing the park owner to charge a resale-assignment fee of an unspecified amount up to $1,500. The defendant appears to concede that his failure to specify the amount of the fee violated this provision. He argues, however, that the phrase "any other charges" contained in section 9 is unconstitutionally vague.

The language of a statute is unconstitutionally vague when the terms "of the statute are so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 299-300; *Redemske v. Village of Romeoville* (1980), 85 Ill. App. 3d 286, 291.) In other words, in order for a statute to be constitutional, the ordinary person must be capable of appreciating from the language of the statute how he will be affected by its operation. *Redemske v. Village of Romeoville* (1980), 85 Ill. App. 3d 286, 292.

While the phrase "any other charges" is not defined in the statute, it is a commonly used and understood phrase. Although "any other charges" is a general phrase, it is not a vague phrase. The rule of construction known as *ejusdem generis* is helpful in determining the meaning. When general words or phrases follow a set of enumerated things, under this rule the general word is limited in meaning to the same kind or class as those previously enumerated. (*Farley v. Marion Power Shovel Co.* (1975), 60 Ill. 2d 432, 436.) A mobile home landlord of common intelligence who intended to impose a charge on a tenant's sale of his mobile home and assignment of his lease rights would be aware that this charge would be included in the section 9 category of "any other charge." We conclude that section 9 does not appear to be unconstitutionally vague.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

SEIDENFLED, P. J., and UNVERZAGT, J., concur.